**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| JAMILA SWIFT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CAUSE NO.: 2:11-CV-00401-TLS-PRC |
| v. | ) | |
| | ) | |
| DIRECTBUY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| JANICE HARRIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CAUSE NO.: 2:11-cv-00415-TLS-PRC |
| v. | ) | |
| | ) | |
| DIRECTBUY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BRIAN VANCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CAUSE NO.: 2:11-cv-00417-TLS-PRC |
| v. | ) | |
| | ) | |
| DIRECTBUY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PHIL GANEZER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CAUSE NO.: 2:12-cv-00045-TLS-PRC |
| v. | ) | |
| | ) | |
| DIRECTBUY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

CHI1 1997351v.6

## TABLE OF CONTENTS

I.     Introduction ....................................................................................................1

II.    Background and Allegations ...........................................................................3

     A.     DirectBuy's Business Model ................................................................3

     B.     Plaintiffs' Allegations ........................................................................4

     C.     DirectBuy's Defenses ........................................................................6

III.    Standard for Approval of Class Settlement ....................................................9

IV.    The class response to the settlement was overwhelmingly positive. ................10

V.    The few objections provide no basis to deny approval of the settlement. .........12

VI.    Class notice was effective and appropriate. ....................................................17

VII.    The settlement amount is appropriate given the weakness of Plaintiffs' claims, the time and expense it would take to proceed to judgment, and DirectBuy's leveraged financial condition. ..................................................................................................20

     A.     Plaintiffs' claims are unlikely to succeed. ............................................20

     B.     Plaintiffs would need massive discovery from DirectBuy and third parties, and expert analysis, to even attempt to prove their claims. ..........................................23

     C.     DirectBuy could not pay any substantial judgment. ..............................................24

VIII.    This settlement is substantially different from the prior settlement. ................26

IX.    Conclusion ....................................................................................................27

## **ISSUE STATEMENT**

Whether this Court should grant final approval of the parties' proposed class action settlement agreement.

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Agretti v. ANR Freight System, Inc.*,
  982 F.2d 242 (7th Cir. 1992) ............................................................................15

*Burkholder v. City of Ft. Wayne*,
  750 F. Supp. 2d 990 (N.D. Ind. 2010) ...............................................................10

*Carter v. Anderson Merchandisers, LP*,
  Nos. EDCV 08-00025-VAP, EDCV 09-0216, 2010 WL 144067, at *6 (C.D. Cal. Jan.
  7, 2010) ..............................................................................................................10

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005).................................................................13

*DeBoer v. Mellon Mortg. Co.*,
  64 F.3d 1171 (8th Cir. 1995) ..............................................................................11

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ..........................................................................9, 10

*Feder v. Electronic Data Systems Corp.*,
  248 Fed. Appx. 579 (5th Cir. 2007).....................................................................16

*Grant v. Bethlehem Steel Corp.*,
  823 F.2d 20 (2nd Cir. 1987).................................................................................11

*In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*,
  909 F. Supp. 2d 259 (S.D. N.Y. 2012)................................................................17

*In re Countrywide Financial Corp. Customer Data Sec. Breach Litigation*,
  No. 08–MD–01998, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010)....................19

*In re Initial Public Offering Securities Litigation*,
  No. 21 MC 92, 2011 WL 3792825 (S.D.N.Y. Aug. 25, 2011)............................16

*In re Integra Realty Res., Inc.*,
  262 F.3d 1089 (10th Cir. 2001) ..........................................................................19

*In re Mexico Money Transfer Litigation*,
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) *aff'd* 267 F.3d 743 (7th Cir. 2001) ............11

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  MDL No. 1532, 2011 WL 1398485 (D. Me. Apr. 13, 2011) ..................................11

i

*In re Processed Egg Products Antitrust Litigation*,
  284 F.R.D. 249 (E.D. Pa. 2012).......................................................................................11

*In re Rio Hair Naturalizer Products Liability Litigation*,
  No. MDL 1055, 1996 WL 780512 (E.D. Mich. Dec. 20, 1996)...................................13

*In re Vitamins Antitrust Class Actions*,
  215 F.3d 26 (D.C. Cir. 2000).........................................................................................15

*In re Wireless Telephone Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005).........................................................................................25

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996)......................................................................................9, 11

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*,
  84 F.3d 629 (2nd Cir. 1996)............................................................................................8

*Silver v. Countrywide Home Loans, Inc.*,
  483 Fed. Appx. 568 (11th Cir. 2012)...............................................................................7

*Spillman v. RPM Pizza, LLC*,
  No. 10–349, 2013 WL 2286076 (M.D. La. May 23, 2013)...........................................19

*Stoetzner v. U.S. Steel Corp.*,
  897 F.2d 115 (3rd Cir. 1990).........................................................................................11

*Susquehanna Corp. v. Korholz*,
  84 F.R.D. 316 (N.D. Ill. 1979).......................................................................................25

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ..........................................................................................25

*Uhl v. Thoroughbred Tech.*,
  309 F.3d 978 (7th Cir. 2002) .........................................................................................11

*Walter v. Hughes Communications, Inc.*,
  No. 09–2136, 2011 WL 2650711 (N.D. Cal. July 6, 2011)...........................................18

*Western Select Securities, Inc. v. San Francisco City and County Employees' Retirement
  System*,
  13 Fed. Appx. 679 (9th Cir. 2001)...................................................................................7

*Wilson v. DirectBuy*, Inc.,
  No. 3:09-cv-590 (JCH), 2011 WL 2050537 (D. Conn. May 16, 2011)....................15, 26, 27

**STATE CASES**

*Hillcrest Pac. Corp. v. Yamamura*,
  727 So.2d 1053 (Fla. Dist. Ct. App. 1999) ...............................................................................7

**FEDERAL RULES**

Fed. R. Evid. 407 .........................................................................................................................8

**OTHER AUTHORITIES**

Federal Judicial Center, Judges Class Action Notice and Claims Process Checklist &
  Plain Language Guide, 3 (2010) ...................................................................................18, 19

iii

## DEFENDANTS' MEMORANDUM IN RESPONSE TO OBJECTIONS AND IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT

Defendants DirectBuy, Inc.; United Consumers Club, Inc.; DirectBuy Holdings, Inc.; UCC Distribution, Inc.; Beta Finance Company, Inc.; National Management Corporation; Trivest Partners IV, Inc.; the Sequoia Group – Thousand Oaks, LLC; The Sequoia Group – Burbank, LLC; Capire, LLC; DBHB, LLC; Hunter Direct, Inc.; Seavers Group, LLC; and Tayden Enterprises, L.P. ("Defendants") submit the following memorandum in response to objections and in support of this Court's final approval of a class action settlement in this case.

## I.      Introduction

Defendants agree with Plaintiffs that this Court should enter the proposed Final Judgment Order certifying a settlement class in this case and granting final approval to the settlement the parties reached in this case. Plaintiffs submitted a Motion for Final Approval (Dkt. No. 171) detailing many reasons why the Final Judgment should be entered, and Defendants agree with and adopt the reasoning in favor of final approval set forth in Plaintiffs' motion. Defendants submit this separate brief to further respond to the objections that have been made to the settlement, including the objections filed after Plaintiffs' motion, and to provide further arguments in support of the proposed Final Judgment.

Very few objections were filed—only 18[1] out of a class of over 800,000—and one of those objections has been withdrawn. The tiny number of objections demonstrates that the overall reaction of the class to the settlement was overwhelmingly positive. More than 48,000 class members filed claims to participate in the settlement (another 83,380 will receive their settlement benefits without having to file a claim), compared to a total of 443 who opted out or

---

[1] While Plaintiffs reference 23 objections as having been filed in their brief in support of final approval, Plaintiffs inadvertently counted four different objectors twice and also incorrectly included Eugene Smalls' request for a replacement claim form (Dkt. No. 167) as an objection.

objected. In other words, less than one-tenth of one-percent of the class expressed any adverse reaction at all (by either objecting or simply opting out). In sharp contrast, over 100 times more class members had a positive reaction to the settlement (by filing a claim) than a negative reaction. This wide gap between the very large positive response and a very small negative response strongly supports the settlement.

Further, the few objections that were filed provide no basis for rejecting the settlement reached by the Parties. Predominantly, the objections are simply vague complaints that the settlement amount is too low or that the requested attorneys' fees are too high. Such generalized objections are entitled to little, if any, weight. The handful of objections that make specific complaints are either factually inaccurate or would not support the Plaintiffs' claims.

The other relevant factors support settlement too. As Defendants will show below, Plaintiffs have very weak claims and a low likelihood of success in this case. Thus, the settlement provides a meaningful benefit to class members where none is warranted. Further, Plaintiffs would be required to go through lengthy and expensive discovery, including substantial expert analysis, to even try to prove their dubious claims. And, as Plaintiffs pointed out in their motion, DirectBuy's financial condition is highly leveraged, and unsecured assets are simply not available to satisfy any significant judgment. Thus, even if Plaintiffs somehow received a large class verdict, no unencumbered money would be available to satisfy that verdict, and the class would still receive nothing.

For these reasons, and the reasons set forth in Plaintiffs' motion, this court should enter the proposed Final Judgment certifying the Settlement Class and approving the class settlement.

CHI1 1997351v.6

## II.     Background and Allegations

### A.     DirectBuy's Business Model

DirectBuy, Inc. is the franchisor of a national network of buying clubs. Declaration of James O'Keefe, attached hereto as Exhibit 1, ¶ 2. DirectBuy's franchisees operate branded DirectBuy clubs, which range in size from 6,000 to 15,000 square feet (and sometimes even bigger), and feature large catalog showrooms with samples of selected merchandise. *Id.* The franchisees sell consumers DirectBuy club memberships, which enable the consumers to purchase furniture, cabinetry, flooring, and many other products directly from manufacturers and their authorized suppliers at direct prices, without hidden retail markups. *Id.* ¶ 3. Currently, there are over 100 DirectBuy clubs in the United States and Canada. *Id.*

DirectBuy provides its members with significant savings. DirectBuy accomplishes this in two ways. First, DirectBuy employs a talented group of buyers, with extensive experience in their respective categories, who negotiate with manufacturers to obtain the best possible pricing for club members. *Id.* ¶ 4. Because of the numerous different product categories and industry segments in which DirectBuy's hundreds of vendors operate, the extent of savings from retail pricing varies by product, but typically ranges anywhere from 8% to 60%, depending on the product category. *Id.*

Second, DirectBuy and its franchisees impose no hidden mark-ups on the price of products sold to members. *Id.* ¶ 5. Rather, DirectBuy and its franchisees derive their principal income from membership fees that consumers pay to join a club (typically in the $4,500 range for the initial twelve months to three years) and membership renewal fees (typically about $200 a year for additional years up to a total of ten years of membership). *Id.*

DirectBuy communicates the advantages of a DirectBuy membership to consumers at in-person presentations at DirectBuy clubs. *Id.* ¶ 9. Before purchasing a DirectBuy membership, a

3

consumer attends a presentation at a DirectBuy club. *Id.* While DirectBuy provides scripts for this presentation, the franchisees' salespeople frequently go off script. *Id.* Such freelancing is required to field specific consumer questions. *Id.* Indeed, a large portion of the sales process consists of in-depth question and answer sessions between the individual potential members and the particular sales representative with whom they are dealing. *Id.* Further, salespeople often compare DirectBuy's prices to ads published by local retailers. *Id.* And of course, different consumers have different reasons and goals for purchasing a DirectBuy membership. *Id.* As a result, each series of events leading to the sale of a DirectBuy membership is unique, based on the interpersonal interactions between consumers—with their unique needs and perspectives— and their salesperson.

The value of a DirectBuy membership to consumers is best demonstrated by consumer behavior. Since 2005, over 500,000 consumers have decided to become members, and, since 2009, over 76% of DirectBuy members have chosen to pay to renew their memberships each year. Declaration of Jesica Cherry, attached hereto as Exhibit 2, ¶ 2. Further, DirectBuy members annually purchase over $400 million worth of merchandise, demonstrating the substantial use members make of their membership. Ex. 1 ¶ 10.

### B.      Plaintiffs' Allegations

Plaintiffs are a group of current and former DirectBuy members who filed four putative class actions against DirectBuy and related entities in several courts around the country. These cases have now been transferred and consolidated before this Court.

Plaintiffs allege that DirectBuy members do not save money relative to purchasing at traditional retail stores. Plaintiffs also complain about two terms of DirectBuy's membership agreement: the addition of shipping and handling fees to the manufacturers' price; and the fact that the membership cannot be cancelled.

4

Plaintiffs further allege that they were misled about DirectBuy's business practices, particularly about the promise to charge no hidden retail markups, because DirectBuy sometimes receives certain discounts and promotional funding from manufacturers. Specifically, Plaintiffs complain that two types of arrangements somehow violate the representation that DirectBuy charges no hidden retail markups.

First, certain vendors purchase advertising from DirectBuy. For example, as a benefit to its members, DirectBuy publishes its quarterly Direction[2] catalog and runs multiple Club Exclusives email offers every week, providing extraordinary special values on the merchandise that the vendors promote in those offers. *Id.* ¶ 6. Vendor purchases of space in Direction and for Club Exclusives cover part of the cost of publishing the catalog and creating the Club Exclusive emails. *Id.* These ad purchases have no effect, however, on the prices that DirectBuy members pay for merchandise from the vendor. *Id.* Thus, were DirectBuy to refuse vendors' advertising dollars, the prices that members pay would remain the same, but members would lose access to the array of products offered at special prices via the Direction Catalog and Club Exclusives. *Id.*

Second, certain manufacturers extend DirectBuy an early-payment discount. *Id.* ¶ 7. These industry-standard discounts are available because of DirectBuy's extremely efficient order placement and payment systems that, along with DirectBuy's four hundred million dollars of annual purchasing volume, are among the key reasons why suppliers value doing business with DirectBuy. *Id.* Again, these early-payment discounts do not affect the vendors' published price lists to DirectBuy members, which the manufacturer does not adjust depending on whether or not DirectBuy, in managing its cash flow, avails itself of any early-payment discount that may be

---

[2] Beginning with the 2013 Holiday edition, the name of the "Direction" catalog will become "Inspired". For convenience, this brief will refer solely to "Direction".

5

available. *Id.* Thus, regardless of whether DirectBuy avails itself of early-payment discounts or not, the pricing the vendors provide to DirectBuy members stays the same.

C.      **DirectBuy's Defenses**

Absent a settlement, Defendants are confident they would prevail in challenging the merits of Plaintiffs' claims, either on a motion to dismiss or a motion for summary judgment.

Regarding Plaintiffs' claim that DirectBuy members do not enjoy savings over traditional retail stores, DirectBuy has ample evidence to the contrary. DirectBuy staffs a "Pricing Promise" program from its corporate headquarters in Merrillville, Indiana. *Id.* ¶ 12. DirectBuy generally monitors prices available in the marketplace to confirm that DirectBuy's prices do indeed beat publicly-available retail and internet pricing. *Id.* Further, when members bring to DirectBuy's attention that an identical item may be available elsewhere for a lower price for whatever reason (including loss-leader, product bundling, and other below-cost pricing strategies that retailers from time to time employ), DirectBuy verifies whether the pricing issue is valid, and if so, works with the manufacturer at issue to ensure that members receive a better price through DirectBuy than what they saw at retail. *Id.* As a result of DirectBuy's efforts, DirectBuy's latest survey reveals that its prices are typically from 8% to 60% below traditional retail prices, depending on the category of merchandise being purchased. *Id.*

It is true that some categories of products (e.g., consumer electronics) provide diminished opportunity for savings because the products carry little markup at retail and quickly become obsolete (leading to close-out pricing). *Id.* ¶ 13. But DirectBuy informs consumers of this fact before they become members. *Id.* And other categories of products (e.g., kitchen cabinetry) offer substantial savings. *Id.* Also, retailers sometime sell products as a loss-leader or as part of other low-cost marketing strategies. DirectBuy discloses to members that this may happen and also asks them to inform DirectBuy when it does occur so that DirectBuy may work with its suppliers

6

to obtain lower prices for the members in order to beat the competition on that product. *Id.* ¶ 14. Thus, DirectBuy is confident that if this case proceeded, it could show with overwhelming evidence that its prices are substantially lower than traditional retail stores or internet sites (which also rely on markups to make their profits).

Plaintiffs' claims regarding shipping/handling fees and no right of cancellation are odd because those terms are explicitly disclosed to Plaintiffs in their membership agreement. Plainly, there can be no claim for misrepresentation over membership terms that were disclosed in the membership agreement that plaintiffs signed.  *See Silver v. Countrywide Home Loans, Inc.*, 483 Fed. Appx. 568, 570 (11th Cir. 2012) (holding that a fraud claim fails where plaintiff "could not reasonably be deceived by any oral statements that were at variance with written terms to which she agreed") (citing *Hillcrest Pac. Corp. v. Yamamura*, 727 So.2d 1053, 1056 (Fla. Dist. Ct. App. 1999) ("A party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract."). Here, the existence of shipping and handling fees was explicitly disclosed in the membership agreement. *See, e.g.,* Ex. 2-F, 2-G, and 2-H. The fact that a membership could not be cancelled once it was purchased was disclosed as well. *Id.*[3] Thus, these allegations provide no support to plaintiffs' misrepresentation claim.

Similarly, Plaintiffs cannot support a claim that DirectBuy somehow misrepresented the lack of a hidden retail markup. It is axiomatic that fraud requires proof of a misrepresentation and that the misrepresentation was material. *See, e.g., Western Select Securities, Inc. v. San Francisco City and County Employees' Retirement System*, 13 Fed. Appx. 679, 681 (9th Cir.

---

[3] As set forth below, certain States and Provinces require a right of cancellation on contracts like the DirectBuy membership agreement. Accordingly, membership agreements entered into in these jurisdictions contain  a 3-day right of cancellation; membership agreements entered into outside of these jurisdictions do not contain  3-day right of cancellation.

2001) (listing elements of fraud under California law). Similarly, consumer protection claims often require proof that a purported representation was likely to mislead consumers and that the representation was material. *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 636 (2nd Cir. 1996) (explaining elements that must be shown to demonstrate that a practice is deceptive under the New York consumer protection statute).

Here, neither element exists. There was no misrepresentation because DirectBuy and its franchisees charge no hidden retail markup. Ex. 1 ¶¶ 3, 5. The discount and promotional funding DirectBuy receives has no impact on the prices paid by DirectBuy members. *Id.* ¶¶ 6-7. In other words, members receive the vendors' pricing with no hidden margin added by DirectBuy or its franchisees. *Id.* ¶¶ 3, 6-7. So there has never been a misrepresentation.

Further, statements about prompt payment discounts and promotional funding are simply not materials to consumers' decision to join DirectBuy. Nevertheless, in July 2009, after cases like these began making an issue of it, DirectBuy began disclosing its receipt of early-payment discounts and cooperative advertising funds to members in the DirectBuy membership guide.[4] *Id.* ¶ 8, Ex. 1-A. Consumers receive this guide when they purchase a DirectBuy membership. *Id* ¶ 8. Since these disclosures started, DirectBuy is not aware of a single consumer ever raising any concern over DirectBuy's receipt of these funds or declining to join on this basis and these disclosures have not deterred over 200,000 new members from joining since the disclosures began. *Id.* ¶ 8; Ex. 2 ¶ 2. That is hardly surprising: no sensible consumer's decision to purchase a DirectBuy membership would be dictated by whether DirectBuy sometimes receives small (1-2%) amounts which have no effect on the price the member pays for a product, any more than a

---

[4] DirectBuy's decision to make these disclosures beginning in July 2009 cannot be taken as support for any contention that it should have made such disclosures earlier. Fed. R. Evid. 407.

consumer would expect to have to pay more than the price-list amounts in the DirectBuy showroom in the event that DirectBuy paid vendor invoices late and thus incurred late charges.

Of course, at this point, there is no need for the Court to rule on the merits of Plaintiffs' claims. *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (in considering whether to approve a class settlement, "[t]he district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights."). But it is important to note that Defendants have substantial defenses to Plaintiffs' claims. Those defenses would make litigation long, expensive, and uncertain for the Plaintiffs.

## III.     Standard for Approval of Class Settlement

Federal courts favor the settlement of class action litigation and should consider the facts presented in the light most favorable to the settlement. *Isby v. Bayh*, 75 F.3d 1191, 1196, 1199 (7th Cir. 1996). A district court's "inquiry is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Id.* at 1196. District courts have considerable discretion in deciding whether to approve a settlement; such decisions are reviewed for an abuse of discretion only. *Id.*

"Among the factors that a district court should consider when it makes this 'fairness' determination are: a comparison of the strengths of plaintiffs' case versus the amount of the settlement offer; the likely complexity, length, and expense of the litigation; the amount of opposition to the settlement among affected parties; the opinion of competent counsel; and, the stage of the proceedings and the amount of discovery already undertaken at the time of the settlement." *Hiram Walker & Sons, Inc.*, 768 F.2d at 889.

In deciding whether to approve a class settlement, a district court should not attempt to resolve the merits of the dispute or make a precise determination of the parties' respective legal

9

rights. *Hiram Walker & Sons, Inc.*, 768 F.2d at 889. Rather, "the essence of a settlement is compromise." *Id.* Thus, "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *Id.*

Further, the process by which the Parties reached settlement provides further evidence that the settlement is lawful, fair, reasonable, and adequate. *See Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 995 (N.D. Ind. 2010) (citing *Carter v. Anderson Merchandisers, LP*, Nos. EDCV 08-00025-VAP, EDCV 09-0216, 2010 WL 144067, at *6 (C.D. Cal. Jan. 7, 2010) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). Plaintiffs' motion points out that a mediator was used. (Dkt. No. 172, p. 2). Specifically, the Parties retained the Hon. Richard E. Neville (Ret.) of JAMS in Chicago to mediate this dispute.  Declaration of P. Russell Perdew, attached hereto as Exhibit 3, ¶ 2. Judge Neville presided over three days of in-person negotiation sessions, and participated in and exchanged hundreds of emails and phone calls with the parties to negotiate a settlement over a two-month period to reach an agreement. *Id.* ¶ 3. Thus, the settlement was non-collusive.

IV.    **The class response to the settlement was overwhelmingly positive.**

One of the relevant factors, "the amount of opposition to the settlement among affected parties," weighs strongly in favor of settlement. Very few objections to the settlement were received—only 18 out of a class of 847,860. [5] And one of those objections was subsequently withdrawn. [6] Such a miniscule level of objections (.002% of the Class) strongly supports approval. Indeed, courts have readily approved settlements with much higher objection rates. *See*

---

[5] None of the objectors gave the required notice of an intention to appear at the Final Approval Hearing. (*See* Dkt. No. 149, ¶¶ 14–15). One objector (Deborah Lemon, Dkt. No. 174) asks for permission to listen by phone.

[6] The objection by Carol and Robert Bierenfeld (Dkt. No. 175) has been withdrawn. *See* Dkt. No. 180.

10

*Isby*, 75 F.3d at 1200 (affirming approval of settlement where "***only*** thirteen percent of class submitted written objections …") (emphasis added). Even if the 425 opt outs were included, that would still represent only .05% of the Class—less than one-tenth of one percent. That also strongly supports approval. *In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (approving settlement; fact that "99.9% of class members have neither opted out nor filed objections … is strong circumstantial evidence in favor of the settlements.") *aff'd* 267 F.3d 743 (7th Cir. 2001). *See also Uhl v. Thoroughbred Tech.*, 309 F.3d 978, 987–88 (7th Cir. 2002) (fact that only 250 of 58,000 class members [.4%] opted out supported approval); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) ("The fact that only a handful of class members objected to the settlement similarly weighs in its favor."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3rd Cir. 1990) (holding that objections by even 10% of class "strongly favors settlement"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2nd Cir. 1987) (affirming approval despite objections from 36% of class).

The small number of objections contrasts sharply with the significant number of class members who chose to participate in the settlement. Only 443 class members opted out or objected, but 48,995 class members (5.8% of the Class) have submitted timely and valid claim forms to participate in the settlement; and another 83,380 did not have to submit a claim in order to obtain settlement benefits. In other words, the reaction of the class has been more than 100 times more favorable than unfavorable. This strongly supports approving the settlement. *In re Processed Egg Products Antitrust Litigation*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (noting that "150 opt-outs is low in comparison to the 905 Claims Forms that were returned" and finding that the class reaction "weighs in favor of the proposed settlement's fairness and adequacy"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, MDL No. 1532, 2011 WL 1398485 (D.

11

Me. Apr. 13, 2011) (finding "favorable" class reaction where 3.9% of eligible class members filed claims).

**V.     The few objections provide no basis to deny approval of the settlement.**

Not only are there few objections, but the objections that were filed are without merit. Six of the seventeen pending objections were vague and generic complaints about the objectors' DirectBuy membership, the amount of the settlement benefit, or the amount of attorneys' fees requested. These objections provide no specific information about problems the members have with DirectBuy or why the settlement benefits and/or attorneys' fees are inappropriate. The objections are unsworn and offer no documents or any other kind of evidence. Specifically:

- Richard Greiner objected that the settlement amount is "wholly inadequate" and "an insult," and asks that members get free renewals for an indefinite period, without any explanation or justification. (Dkt. No. 151).

- Peter and Pamela Spekman submit a four-line objection that the settlement "is not equitable to all members" but never say why they feel that way. (Dkt. No. 152).

- Leticia Arce complained that DirectBuy would not allow her to cancel her membership, despite unrelated financial hardships, but never claims that her membership included a right of cancellation.[7] Ms. Arce also complains of "high pressure" and "unethical" tactics without providing anything specific. (Dkt. No. 156).

- Cindy Chapman objects because she does not believe DirectBuy acted "with good faith," but does not say why she believes that to be so. (Dkt. No. 162).

- Jason Umphrey objects that his DirectBuy membership was a "scam" and "a big rip off," but never says why he thinks that to be the case. He also complains that he was not permitted to cancel his membership, but never claims that his membership included a right of cancellation. (Dkt. No. 163).[8]

- Brenda Weeks filed an objection (Dkt. No. 178) that is probably untimely but in any event is difficult to understand. She claims she signed up for DirectBuy expecting no delivery charges. She says she never used DirectBuy's service, but

---

[7] The membership agreement that Ms. Arce signed did not permit cancellation. *See* Ex. 2-F.

[8] The membership agreement that Mr. Umphrey signed did not permit cancellation.  *See* Ex. 2-G.

then says she used the service once, and "was then made aware of the true costs and became appalled." She never says what these "true costs" were, or why she felt they were appalling.

And, Ms. Weeks's membership agreement makes clear that home delivery will involve an additional charge. Ex. 2-H at p. 3 ("CHARGES APPLIED TO YOUR ORDER") (providing that "Shipping Charges … incurred in getting your merchandise either to the Club or to your home direct from the manufacturer" are paid in addition to the price of the merchandise).

These vague and conclusory objections can and should be disregarded. *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 860 (E.D. Mo. 2005) (approving settlement and finding "without merit" generic objections that settlement provided "no material benefit" and was not "fair to the stockholders"); *In re Rio Hair Naturalizer Products Liability Litigation*, No. MDL 1055, 1996 WL 780512, at *14 (E.D. Mich. Dec. 20, 1996) ("General objections without factual or legal substantiation carry little weight") (quoting 2 *Newberg on Class Actions* 3d, § 11.58).

Four other objections are not only generic and unsupported, but are also based on misunderstandings regarding the terms of the settlement:

- Dawn and John Egan complain that the requested attorneys' fees are too high because they amount to "94.7% of the settlement on a per customer basis." (Dkt. No. 154). In fact, the requested $900,000 in attorneys' fees is less than half of the $1,900,000 settlement fund.[9]

- Jane and Stuart Armstrong complain that the requested attorneys' fees leaves "less than what I paid in postage" as a cash benefit for class members. (Dkt. No. 160). In fact, class members who sought the cash benefit will each receive approximately $20, and possibly more, depending on what the Court actually awards for attorneys' fees and a class representatives' award.[10]

---

[9] Significantly, the Egans have made over $60,000 in purchases through DirectBuy, Inc. over the lifetime of their membership, saving at least $14,402.83. Ex. 1 ¶ 10, Ex. 1-B. Fittingly, given the value the Egans received from their membership, the Egans do not suggest that the settlement benefit is inadequate.

[10] A total of 48,401 of the timely and valid claim forms requested a distribution from the $1,900,000 Settlement Fund. Updated Declaration of the Settlement Administrator, attached hereto as Exhibit 3, ¶ 13. Assuming the Court were to award the requested $900,000 in fees and further assuming the Court were to allow an incentive award of $500 to each of the 34 eligible Class Representatives, each class member who requested distribution would receive approximately $20.31 each.

13

And it is difficult to credit any suggestion by the Armstrongs that they are entitled to any compensation for having purchased a DirectBuy membership. The Armstrongs have purchased over $44,000 in merchandise through DirectBuy, Inc. during their membership. Ex. 1 ¶ 16. The Armstrongs have saved at least $7,438.68 as a result of their DirectBuy membership and are therefore in no position to claim entitlement to damages. *Id.*

- Deborah Lemon objects that the notice sent by DirectBuy "relies entirely on Defendant database [sic] to reach potential class members." (Dkt. No. 174, p. 2). In fact, while email addresses were taken from DirectBuy's database, the Settlement Administrator who sent notice relied on both the U.S. Postal Service's National Change of Address database, and a third-party database maintained by LexisNexis in sending 183,284 notices and claim packages by mail. (Dkt. No. 172-1, ¶ 10).

  Ms. Lemon also objects regarding the ***possibility*** that named Plaintiffs do not include members from the three types of Class Members (Current, Former, and Defaulted). (Dkt. No. 174, pp. 3–4). In fact, all three types of Class Members are represented by one or more named Plaintiffs.[11]

  Finally, it is important to note that Ms. Lemon has been a very loyal and active DirectBuy Member. She has renewed her membership ***nine*** times at a total cost of $1,678 for the renewal fees alone. Ex. 1 ¶ 17. And Ms. Lemon has made ***99*** different purchases through DirectBuy, Inc. for a total of over $122,000 spent. *Id.* As a result of her DirectBuy membership, Ms. Lemon has saved at least $13,218.89 on these purchases. *Id.* So Ms. Lemon has also received substantial value from her membership and is therefore in no position to complain about the amount of the settlement benefit.

- Cathy Lochridge complains about the amount of the settlement benefit, arguing that class members "must continue to do business with DirectBuy." (Dkt. No. 176, p. 2). In reality, a cash benefit is available to class members who do not wish to do further business with DirectBuy. As noted above, the amount of that benefit will be approximately $20.

  Further Ms. Lochridge is in no position to complain about the amount of the settlement benefit. She has obtained significant value from her membership, having made over $11,000 in purchases through DirectBuy, Inc. since becoming a member. Ex. 1 ¶ 18. These purchases resulted in a savings to Ms. Lochridge of at least $1,769.69. *Id.* That value is further demonstrated by the fact that Ms. Lochridge has renewed her membership twice (in 2011 and again 2012) at a cost of $277/year. *Id.*

---

[11] *See* Dkt. No. 181, p. 8.

14

> Ms. Lochridge also makes a generic, one-sentence, complaint that a settlement class should not be certified, but offers no analysis as to why she feels that way. (Dkt. No. 176, p. 2).

These objections are not only generic, but are based on incorrect information, and come from individuals who have received substantial value from their membership. The objections should be dismissed for these additional reasons.

Four other objections are also easily disposed of.

- Kenneth Shortlidge complained about class actions generally, but made no complaints about the adequacy of the settlement benefit. (Dkt. No. 155).

- Objectors Hugh Camitta and Louise Snyder opted out of the settlement. (Dkt. No. 157) ("we are electing to opt out of the settlement"). Thus, they have no standing to object and their objection should be ignored. *See Agretti v. ANR Freight System, Inc.*, 982 F.2d 242, 246 (7th Cir. 1992) ("a nonsettling party does not have standing to object to a settlement between other parties."); *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 29 (D.C. Cir. 2000) ("class members who have opted out of a 23(b)(3) class action have no standing to object to a subsequent class settlement"). *See also* Settlement Agreement (Dkt. No. 137-1, p. 21, ¶ III.F.2) ("Any Class Member who submits a timely opt out request may not file an Objection to the Settlement …").

- John Leftault makes a generic objection to the settlement amount as being "meager" and to the amount of attorneys' fees, but offers no substantiation for either complaint. (Dkt. No. 153).

  Leftault also incorporates an objection filed in 2011 to the prior settlement in *Wilson*. But as explained in more detail below, that objection was made to a completely different settlement with different terms. Specifically, Hebert objected to the provision of a free membership period. *Wilson v. DirectBuy*, Case No. 3:09-cv-00590 (D. Conn.), Dkt. No. 167, p. 9 ("a membership extension is worthless…"). But a membership extension is not among the settlement benefits offered in *this* settlement, so Herbert's objection does not apply.

- Bennett Schliesman (Dkt. No. 165) submitted a lengthy objection that boils down to his vague claim that he was somehow "psychologically coerced" into purchasing a DirectBuy membership as a result of alleged misrepresentations regarding payments DirectBuy receives from vendors. But any claim of coercion is hyperbolic—Schliesman offers nothing to suggest how his free will was overcome—and as explained above, there were no misrepresentations because any payments DirectBuy receives from vendors have no impact on the prices consumers pay, and are therefore immaterial to a consumer's decision to become a DirectBuy member. Significantly, Schliesman never claims that substantial

15

savings were not available to him; he says nothing about DirectBuy's prices at all.

Schliesman also complains about having only three days to cancel his membership rather than ten days. But Schliesman's own attachment shows that the membership application clearly and conspicuously states that he "MAY CANCEL THIS TRANSACTION … WITHIN THREE (3) BUSINESS DAYS …"[12] It makes no sense for Schliesman to claim he was misled about cancellation when the document he signed clearly spelled out the three-day cancellation period.

The remaining three objections (Dkt. Nos. 158, 161, and 164) offer a handful of supposed examples where the class members were disappointed with DirectBuy's prices on specific items, but these unsubstantiated anecdotes do nothing to stop approval of the settlement. None of these objections are sworn, and none offer any documentation to show that a single DirectBuy price was higher than the price charged at retail for the same product. Instead, the objectors simply make unsubstantiated assertions about what they could have paid for items elsewhere, with no evidence that those prices were legitimate or involved identical products. *See* Dkt. No. 161 (claiming another quote for a kitchen renovation was 30% less than DirectBuy's with no other information); Dkt. No. 164 (claiming that DirectBuy's kitchen cabinets were more expensive and "in our opinion, lesser in quality" than other kitchen cabinets from unnamed custom cabinet builders). Given the lack of any factual or evidentiary support, these objections should be disregarded. *In re Initial Public Offering Securities Litigation*, No. 21 MC 92, 2011 WL 3792825, at *2 (S.D.N.Y. Aug. 25, 2011) (holding that pro se objector's "unsigned, unsworn, unauthenticated" evidence was insufficient and refusing to hear objection on that basis) (citing *Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, 581 (5th Cir. 2007) ("Allowing someone to object to settlement in a class action based on this sort of weak, unsubstantiated

---

[12] Although this 3-day right of cancellation is not generally available in DirectBuy membership agreements, some, but not all, States and Provinces require a right of cancellation on contracts like the DirectBuy membership agreement.

16

evidence would inject a great deal of unjustified uncertainty into the settlement process.")); *In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 909 F. Supp. 2d 259, 264, n.3 (S.D. N.Y. 2012) (holding that "objections [that] are conclusory and bereft of factual or legal support… are insufficient to weigh against a finding that the proposed settlement is fair and reasonable, and can be overruled without engaging in a substantive analysis").

And even if one or more of the claims in these letters were true, the fact that a lower retail price may have existed at some point is not illegal or supportive of any claims against DirectBuy. As discussed above, DirectBuy informs customers before they sign up that savings on particular products will vary, and that retail pricing schemes can sometimes beat DirectBuy's prices in some circumstances. Thus, even if the objectors' unsubstantiated claims were credited in their particular instances, that would not support a claim against DirectBuy or be an obstacle to approval.

* * * *

In sum, the very small number of objections that have been made are mostly generic complaints that simply express a preference for a larger settlement. Others are based on a misunderstanding of the terms of the settlement, or simply describe isolated, and unsubstantiated, instances where the member was disappointed with DirectBuy. None of the objections offer evidence of any sort, and even if the unverified assertions are credited, the objections do not show that the proposed settlement is inappropriate or unfair.

## VI.    Class notice was effective and appropriate.

Plaintiffs' motion addressed class notice, but one of the objections filed after plaintiffs' motion raised a question regarding class notice, so Defendants respond further. The Deborah Lemon objection stated that class notice was inadequate. (Dkt. No. 174, p.2). But in reality, the

17

notice provided met industry standards and was far more effective in reaching class members than notice plans that are typically approved.

The Federal Judicial Center's checklist on class notice recognizes that perfection in class notice is not required. Rather, the FJC instructs that class notice should strive to reach between 70% and 95% of the class. *See* Federal Judicial Center, Judges Class Action Notice and Claims Process Checklist & Plain Language Guide, 3 (2010) ("It is reasonable to reach between 70–95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.").[13]

Here, the class notice far exceeded the 70–95% target range established by the FJC. DirectBuy retained, at its own expense, Epiq Class Action and Claims Solution, as the settlement administrator, and this Court approved Epiq as the administrator in its Preliminary Approval Order. (Dkt. No. 172-1, ¶ 1; Dkt. No. 149, ¶ 9). Epiq has implemented the notice plan approved by the Court in the Preliminary Approval Order. Specifically, Epiq sent individualized notice to the class through a combination of email and regular mail. Epiq sent emails to anyone for whom DirectBuy had email addresses, which totaled 722,844 unique email addresses. (Dkt. No. 172-1, ¶ 8). DirectBuy has email addresses for the vast majority of its current and former members because email is the primary method DirectBuy uses to communicate with its members. Ex. 1 ¶ 11.  Epiq took steps that are standard in the settlement administration industry to try to ensure delivery and to minimize the possibility that the email notice would be caught in a spam filter, such as performing quality reviews on the email addresses, sending the emails in small batches,

---

[13] Available at http:// www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf. A copy is also attached hereto as Ex. 4. *See Walter v. Hughes Communications, Inc.*, No. 09–2136, 2011 WL 2650711, at *15 (N.D. Cal. July 6, 2011) (noting that the Federal Judicial Center's Class Action Checklist "provides guidance for judges and counsel in determining whether a notice plan is adequate").

18

and controlling the content of the subject line and emails to avoid spam filter triggers. (Dkt. No. 172-1, ¶ 9).

Where DirectBuy had no email address in its records, or where the email address was found to be invalid through a quality control review, or where an email bounced back as undeliverable, notice was sent by regular mail. (*Id.* ¶ 10). This resulted in Epiq sending 183,284 notices and claim packages by mail. (*Id.*). But before sending anything, Epiq ran the addresses in DirectBuy's records through postal databases to update the addresses. (*Id.*). Epiq used further verification methods for any notices or claim packages that had been sent by mail and that were returned as undeliverable. If the postal service provided a new address with the returned package, Epiq re-mailed the notice and/or claim package to the new address. (*Id.* ¶ 11). If no new address was provided, Epiq searched a third-party commercial database maintained by LexisNexis to find a new address for the class member, and re-mailed the notice and/or claim package to that new address. (*Id.*).

Using these multiple and overlapping methods of locating and verifying contact information for class members, only 8,724 class members remain classified as undelivered. In other words, Epiq has sent actual individualized notice to approximately 99% of the class. (*Id.*). This far exceeds the benchmark set by the Federal Judicial Center, as well as delivery percentages that have been found acceptable in other cases. *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110-11 (10th Cir. 2001) (overruling objections and holding that Rule 23 and due process were satisfied where seventy-seven percent of class members received notice); *Spillman v. RPM Pizza, LLC*, No. 10–349, 2013 WL 2286076, at *2 (M.D. La. May 23, 2013) (approving settlement and noting the "effectiveness of the notice plan" where the delivery percentage was 74-76%); *In re Countrywide Financial Corp. Customer Data Sec. Breach Litigation*, No. 08–

19

MD–01998, 2010 WL 3341200, at *2 (W.D. Ky. Aug. 23, 2010) ("notice process was adequate and consistent with Federal Rule of Civil Procedure 23 and the standards of due process" where "at least 80%" of class members were reached).

Thus, the notice given in this case overwhelmingly meets the requirements of Rule 23 and due process.

**VII.  The settlement amount is appropriate given the weakness of Plaintiffs' claims, the time and expense it would take to proceed to judgment, and DirectBuy's leveraged financial condition.**

**A.  Plaintiffs' claims are unlikely to succeed.**

Given the weakness of Plaintiffs' claims, another relevant factor, "a comparison of the strengths of plaintiffs' case versus the amount of the settlement offer," weighs strongly in favor of approving the settlement. While objectors (like all litigants) would like to be given more money, the fact is that the Class has a very low likelihood of recovering anything if this case were to proceed. Thus, the settlement provides significant benefits for the Class that they would not otherwise receive.

Plaintiffs' claims in this case are weak. Some Plaintiffs claim that DirectBuy does not offer significant savings over retail pricing, but as shown above, DirectBuy offers substantial savings over retail in every one of its product categories. A small sample of evidence supporting DirectBuy's savings is discussed above; DirectBuy could offer much more if the case were to proceed. By contrast, objectors offer no documentary evidence, sworn testimony, or even detailed factual allegations, to show that DirectBuy does not regularly offer substantial savings over retail pricing. All objectors can give are vague and unsworn anecdotes about isolated instances where the objectors allegedly found better prices (supposedly—but not shown to be— on identical products) elsewhere. This does not support a cause of action, and certainly does not derail the Parties' settlement.

Plaintiffs' claims are also built on the idea that DirectBuy somehow misled or deceived class members into purchasing a DirectBuy membership with the statements that DirectBuy members pay no hidden retail markup. But as shown above, that statement is 100% true.

The early-payment discounts and the purchase of advertising space in DirectBuy's catalog and Club Exclusive emails do not result in higher merchandise prices for DirectBuy members. DirectBuy's cash management allows it to take advantage of early-payment discounts, but members would pay the same prices whether or not DirectBuy availed itself of those discounts. Plaintiffs' claim that they were somehow entitled to the benefit of the early-payment discounts is a non-starter. If DirectBuy had failed to pay its vendors on time and incurred late-payment penalties, obviously the members would not be asking DirectBuy to pass those penalties along to the members. In other words, any discounts or penalties incurred because of how or when DirectBuy paid its vendors is completely separate from the catalog price lists members use in purchasing merchandise.

Further, DirectBuy's sale of advertising space in its quarterly catalog has nothing to do with the price members pay for merchandise. Vendor payments for advertising allows DirectBuy to offer the catalog and Club Exclusives emails, and to offer and highlight special promotions from vendors who choose to advertise. If DirectBuy were to refuse to accept these vendor payments, the prices paid by members for merchandise would be unaffected. All that would happen is members might no longer receive the benefits of the very popular quarterly catalog and the weekly Club Exclusives emails.

No evidence supports the claim that early-payment discounts or the purchase of advertising affects the prices paid by DirectBuy members or is material to a consumer's decision to join DirectBuy. None of the objectors offer any such evidence. Indeed, only one objector

21

(Schliesman, Dkt. No. 165) even mentions allegations about these alleged misrepresentations, and Mr. Schliesman offers absolutely no evidence, or even information, to show that early-payment discounts or vendor advertising had any adverse effect on the pricing DirectBuy members enjoy. Thus, there is simply no basis in the record to conclude that Plaintiffs' misrepresentation claims are viable in any way.

Finally, many members of the Class would have significant difficulty proving they were damaged by their DirectBuy memberships. Many members made a substantial amount of purchases with their DirectBuy membership. For example, as mentioned above, objector Deborah Lemon has made 99 different purchases through DirectBuy, Inc. for a total of over $122,000 spent with a savings of at least $13,218.89. Another set of objectors, the Egans, have made over $60,000 in purchases through DirectBuy, Inc. over the lifetime of the Egans' membership, with a savings of at least $14,402.83. Objectors Stuart and Jane Armstrong purchased over $44,000 in merchandise through DirectBuy, Inc., with a savings of at least $7,438.68. Similarly, Objector Cathy Lochridge made over $11,000 in purchases through DirectBuy, Inc. since becoming a member, with a savings of at least $1,769.69. It is difficult to understand how people who have made such substantial purchases, and enjoyed such substantial savings, will be able to prove they were damaged by their membership. And, these examples are not simply cherry picked from hundreds of thousands of class members; these examples are all from the very small number of *objectors*, who presumably feel they had negative experiences with their memberships. So, there are undoubtedly numerous others among the 800,000+ members of the Class who will have substantial difficulty proving that they were damaged. This further reflects the weakness of Plaintiffs' claims.

22

**B.      Plaintiffs would need massive discovery from DirectBuy and third parties, and expert analysis, to even attempt to prove their claims.**

Similarly, "the likely complexity, length, and expense of the litigation" weighs in favor of settlement as well. DirectBuy believes that the allegations in this case are so thin as to be susceptible to a motion to dismiss. But if this case got past a motion to dismiss, the discovery and work needed to attempt to prove Plaintiffs' allegations would be tremendous. The Class Period in this case spans over ten years, indicating a large potential scope of discovery. Regarding the claim that DirectBuy does not offer significant savings over retail, discovery would be needed into the pricing on the millions of products DirectBuy has offered for sale over the last ten years, as well as the pricing offered by retail outlets for the same products in the same period. There would undoubtedly be disputes about whether certain products offered by retailers were the same as products offered by DirectBuy, so discovery into specific product features would be required. Discovery would also be needed into any unique circumstances surrounding retail pricing (e.g., close outs, loss leaders), which would add another layer of complexity. This discovery could also extend far beyond the Parties to DirectBuy vendors, as well as to third-party retailers and their suppliers, many of which may no longer be in business. And dueling experts would undoubtedly be needed to review and analyze these mountains of data. Thus, it would be a monumental undertaking for Plaintiffs to attempt to create any reliable comparison between DirectBuy pricing and that of countless retailers on millions of products going over the past ten-year period.

It would be a similarly daunting task for Plaintiffs to attempt to prove that industry-standard early-payment discounts and vendor purchases of advertising had any impact on the prices DirectBuy members paid for merchandise. Massive third-party discovery would be required from some significant portion of DirectBuy's many hundreds of vendors over a ten-year period to determine what price they charged DirectBuy, whether those vendors offered early-

23

payment discounts or purchased advertising, and whether the discount (assuming that DirectBuy, in the management of its cash flow, accepted the early-pay discounts offered) affected the pricing to DirectBuy members. Comparisons would also likely be needed between the pricing given to DirectBuy and the pricing given to other retail outlets—some of the most sensitive, confidential information one can imagine. Motion practice on third-party subpoenas in courts across the country and internationally, wherever vendors are located, would therefore be entirely foreseeable. And expert analysis would again be needed to make some sense of all the information and documents obtained through discovery.

In short, before Plaintiffs could escape summary judgment, and before they ever reached a jury in hopes of obtaining a substantial judgment, they would first need to invest a substantial amount of time and a massive amount of money to develop evidence in an attempt to support their flimsy claims. This further weighs in support of approving the settlement.

### C.     DirectBuy could not pay any substantial judgment.

Several objectors say they want to be given more money, including a full refund from DirectBuy of the price they paid (to the franchisees, not DirectBuy) for their DirectBuy membership. *See, e.g.,* Dkt. No. 178 (demanding refund of $4,990); Dkt. No. 164 ("DirectBuy should refund my membership in full [in the amount of] $5,834.68").[14] But the fact of the matter is that the Class will simply never see any significant cash award. Beyond the very low likelihood that Plaintiffs will ever prevail on their claims, and the years of time and substantial expense that Plaintiffs would have to invest in prosecuting their claims, DirectBuy's highly-leveraged financial condition would prevent the Class from ever collecting on any judgment.

---

[14]   If every class member made a similar dollar demand, the total would be over $1 billion and would wipe out any company DirectBuy's size.

DirectBuy produced confidential, audited financial statements to Plaintiffs' counsel (one of whom is a CPA) so that Plaintiffs could verify DirectBuy's financial condition. These financial statements confirmed that DirectBuy simply does not have tangible assets available to satisfy a judgment of any magnitude. As Plaintiffs discussed in their brief, DirectBuy has substantial secured debt—over $130 million that grows by approximately $1 million/month— that exceeds the value of DirectBuy's tangible assets. Thus, even if Plaintiffs chose to invest the substantial time and money that would be required to bring their claims through trial, and even if Plaintiffs actually managed to succeed on one or more of their claims and obtain a significant verdict on behalf of the Class, there would simply be no money available to satisfy that judgment. Rather, DirectBuy's secured creditors would exhaust the tangible assets before unsecured creditors like the Plaintiffs could collect anything.

After confirming DirectBuy's financial condition, Plaintiffs' counsel made the sensible decision to get what they could for the Class rather than invest hundreds of thousands of dollars (or more) in years of litigation that had a slim chance of obtaining a successful verdict, and no chance of collecting on any such verdict. This further demonstrates that the settlement is fair and reasonable. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("Here one factor predominates to make clear that the district court acted within its discretion [in approving the class settlement]. That factor is [the defendant's] financial condition."); *In re Wireless Telephone Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932–33 (8th Cir. 2005) (requiring district courts to consider a defendant's financial condition when evaluating class action settlement agreements); *Susquehanna Corp. v. Korholz*, 84 F.R.D. 316, 321 (N.D. Ill. 1979) (holding that a defendant's "very poor" financial condition is "supportive of a finding that the settlement at issue is fair and adequate").

25

**VIII.   This settlement is substantially different from the prior settlement.**

As this Court knows, Defendants previously attempted to settle a similar class action[15] filed in the District of Connecticut. That settlement was rejected by Judge Janet Hall. *See Wilson v. DirectBuy, Inc.*, No. 3:09-cv-590 (JCH), 2011 WL 2050537 (D. Conn. May 16, 2011). But this Settlement is dramatically different from the settlement that was previously rejected.

Most significantly, the prior settlement involved no cash; the benefit was a free two-month membership period. *Wilson*, 2011 WL 2050537, *3. As a result, Judge Hall found that the prior settlement "resembles a coupon settlement which provides little or no value to class members." *Wilson*, 2011 WL 2050537, *6.[16] By contrast, the current settlement offers actual cash benefits from a fund of $1.9 million. Based on the number of class members who submitted claims requesting a cash payment, and depending on the Court's fee award to Plaintiffs' counsel, each class member who submitted a claim form to share in the fund will receive approximately $20 in cash under this settlement. This indisputably represents real value to class members and a real cost to Defendants. Thus, unlike the prior settlement, there can be no claim that "the value to the class is … overstated" or that "the dollar amount ascribed to the benefit does not represent its actual cost to DirectBuy." *Id.* at 6–7.

Moreover, while Current DirectBuy Members are able to choose a $10 discount on a purchase of $20 or more, this is a choice rather than the only available benefit. Thus, there can be no argument that only those class members who wish to make a purchase from DirectBuy receive a benefit. *Cf. Id.* at *7 ("assuming that nearly all former members have *no* interest in continued membership … more than half the class appears to be without a benefit.") (emphasis

---

[15] These four consolidated cases all make similar allegations to the original Connecticut filing.

[16]   To be clear, DirectBuy did not agree then, and does not agree now, with Judge Hall's conclusion. But the conclusion is inapplicable here given the substantial differences in the two settlements.

26

in original). Further, the low purchase requirement to redeeming the discount ($20 or more) means there is no significant barrier to redemption. And members have many products to choose from at the $20 price-point.

Additionally, Judge Hall did not consider DirectBuy's financial condition in evaluating the settlement because the parties did not bring that issue to her attention. *Wilson*, 2011 WL 2050537, *13. But as Plaintiffs' motion points out, Plaintiffs here relied heavily on DirectBuy's highly-leveraged financial condition, and resulting inability to satisfy a significant judgment, in deciding to accept this settlement.

Finally, the prior settlement attracted substantially more objection than this settlement. Indeed, a group of thirty-nine state Attorneys General filed a joint brief objecting to the settlement. *See* Case No. 3:09-cv-590 (D. Conn.) Dkt. No. 161. Judge Hall found that "the forceful brief filed by the thirty-nine attorneys general strongly recommend[s] denial." *Wilson*, 2011 WL 2050537, *10. By strong contrast, the settlement here has attracted only the very few *pro se* objections discussed above, and one objector who is represented by counsel. Thus, this settlement has nothing like the substantial and organized opposition that the prior settlement in Connecticut faced.

Accordingly, none of the multiple barriers to the Connecticut settlement exist here.

## IX.    Conclusion

This settlement provides a real benefit to a Settlement Class with very dubious claims. The fairness of this settlement is best demonstrated by the overwhelmingly positive reaction of the class—more than 100 times as many class members asked to participate in the settlement as those that objected or opted out. And the miniscule number of objections that were made are unsworn, vague, and conclusory. There is no certainly evidence to suggest that the class could prove that they were misled into joining DirectBuy. Rather, the undisputed evidence shows that

27

DirectBuy has substantial defenses to the claims in these cases. Even if the class could get past dispositive motions and to a jury, it would only do so after years of expensive discovery and expert analysis. And even if the class could convince a jury to enter a significant verdict in their favor, DirectBuy simply lacks the unsecured assets needed to satisfy any such judgment. Thus, the class has no realistic hope of securing a substantial judgment against DirectBuy. This settlement is a fair and reasonable alternative. This Court should heed the wishes of the class, as expressed in the class's reaction to the settlement, and approve the settlement.


Dated:  August 27, 2013                          Respectfully submitted,

                                                 /s/ P. Russell Perdew
                                                 P. Russell Perdew
                                                 Locke Lord LLP
                                                 111 S Wacker Drive, Suite 4100
                                                 Chicago, IL 60606-4410
                                                 312-443-1712
                                                 Fax: 312-896-6712
                                                 Email: pperdew@lockelord.com

                                                 Counsel for Defendants DirectBuy, Inc.,
                                                 United Consumers Club, Inc., DirectBuy
                                                 Holdings, Inc., National Management
                                                 Corporation, Beta Finance Company, Inc.,
                                                 UCC Distributions, Inc., Trivest Partners IV,
                                                 Inc. in *Swift, Vance, Harris* and *Ganezer*

CHI1 1997351v.6

## **CERTIFICATE OF SERVICE**

I, P. Russell Perdew, an attorney, certify that I caused the foregoing to be served upon all persons and entities registered and authorized to receive such service through the Court's Case Management / Electronic Case Files (CM/ECF) system on August 27, 2013.


/s/ P. Russell Perdew_____

29